Tex. Cr. R. 613, 111 S. W. 157, in which it was held the intent was not sufficiently established.

[2] We are not prepared to hold that the evidence in the instant case was not sufficient to sustain conviction, but are of the opinion that in the matter of identity and specific intent to rob the evidence is left in a condition to render it necessary that the jury determine by inference from facts rather than from direct testimony that the appellant is guilty, and we think the appellant's request that the jury be instructed upon the law of circumstantial evidence should have been granted.

[3, 4] Complaint is made of the exhibition of the wounds received by Reed in the encounter. As the matter is presented, we think that this would not justify a reversal of the case, for the reason that the indictment included a charge on aggravated assault, and the character of wounds received might have enabled the jury to decide that issue, if it had been submitted to them, and in this connection we suggest that upon another trial it should be submitted.

For the reasons pointed out, the judgment is reversed and the cause remanded.

---

**TEXAS & P. RY. CO. et al. v. McDOWELL et al. (No. 576.)**

(Court of Civil Appeals of Texas. Beaumont. May 25, 1920.)

**1. Carriers ⬦215(1)—Carrier held not liable for negligence in having caused castration of bulls shipped.**

A railway company was not liable to a shipper of cattle for negligence in causing bulls in a shipment to be castrated, where the carrier, intending to comply with quarantine regulations, refused to receive the bulls for shipment unless they were given the tubercular test or castrated, and the shippers exercised their choice and themselves castrated the bulls.

**2. Appeal and error ⬦1175(1)—On reversal judgment will be rendered where no different result probable on new trial.**

Where judgment is reversed, and it appears that the case was fully developed and that no different result would probably be reached by remanding, judgment will be rendered for appellant.

Appeal from District Court, Shelby County; Chas. L. Brachfield, Judge.

Suit by H. L. McDowell and another against the Texas & Pacific Railway Company and others. Judgment for plaintiffs against the named defendant, and it appeals. Reversed and rendered.

Young & Stinchcomb, 'of Longview, and E. H. Carter, of Center, for appellant.

Sanders & Sanders and J. P. Anderson, all of Center, for appellees.

HIGHTOWER, C. J. This was a suit by the appellees, H. L. McDowell and J. E. Burton, filed in the district court of Shelby county against the Texas & Pacific Railway Company and its receivers, and also against the Gulf, Colorado & Santa Fé Railroad Company; the purpose of the suit being to recover damages to a shipment of cattle from Waldo, Ark., to Timpson, Tex. The shipment consisted of about 286 head of cattle, and among them were 137 head of bull yearlings between one and two years of age. The appellees, McDowell and Burton, resided at Timpson, in Shelby county, Tex., and were engaged in the dairy business at that place, and also in buying and selling cattle generally. About the 28th day of March, 1916, they went to Waldo, Ark., and purchased the 286 head of cattle which constituted the shipment in question, and made an effort to make a through shipment of the cattle from Waldo, Ark., to Timpson, Tex., but the Cotton Belt Railroad Company at Waldo refused and declined to accept the cattle for through shipment to Timpson, Tex., but would only receive them for shipment as far as Texarkana. Thereupon appellees shipped the cattle down to Texarkana, Tex., and from there shipped them over the road of the Texas & Pacific Railway Company and its connecting carrier, the Gulf, Colorado & Santa Fé Railroad Company, to Timpson, Tex. The cattle reached Texarkana from Waldo about 8 o'clock in the morning of March 29, 1916, and it was the purpose of appellees to ship them out of Texarkana direct to Timpson as soon as arrangements could be made for cars at Texarkana for that purpose. Arrangements were made some time in the afternoon of March 29, 1916, the agent of the Texas & Pacific Railway Company agreeing with appellees to furnish the cars so that the shipment might move from Texarkana that night; but when said agent ascertained, which he did before the cattle were received or loaded, that there were a number of bulls in the shipment, he told appellees that on account of quarantine regulations he would have to decline to receive the shipment with the bulls in it, and referred appellees to Mr. James, who was the live stock agent of the Texas & Pacific Railway Company at Texarkana.

Appellees then went to Mr. James, as agent of the Texas & Pacific Railway Company at that point, and took the matter up with him, and Mr. James explained to them that because of quarantine regulations which he had been advised were in effect his road was prohibited from accepting a shipment of bulls into Texas unless the shipment was accompanied by a health certificate, in accordance with the rules and regulations of the live stock sanitary commission of the state of Texas. Thereupon Mr. James and appellees sought Dr. Hearn, who was a veterinarian at Texarkana, and who was registered as such with the live stock sanitary commission of Texas, and who represented both the state of Arkansas and the state of Texas in the official capacity of inspector of live stock for interstate shipment. It was explained to Dr. Hearn that appellees desired to ship said cattle to Timpson, Tex., and it was also explained by appellees that the cattle were not intended for dairy or breeding purposes or for exhibition in the state of Texas, but that appellees intended to put them on the range and resell them, etc. Dr. Hearn explained to appellees, in the presence of Mr. James, that he could not permit the shipment of the bulls into Texas unless they were accompanied by a health certificate showing that they had been tested for tuberculosis within 60 days prior thereto, and when it was admitted by appellees that they had no such certificate Dr. Hearn stated that the shipment of the bulls would not be permitted unless they were given a tubercular test. At that point Mr. James, in his capacity as live stock agent for the Texas & Pacific Railway Company, told appellees that his road could not receive the bulls for shipment until they were given the tubercular test, or castrated. Thereupon the Texas & Pacific Railway Company's agent declined to issue a bill of lading for the shipment of cattle, and appellees consulted further with Dr. Hearn and asked him if the shipment of the bulls would be permitted if they were castrated, and Dr. Hearn told him "Yes," and appellees asked him what the cost would be of castrating the bulls and were advised that it would be 50 cents per head. They then asked him if they might not do the work themselves, and Dr. Hearn stated that they might, and that no charge on his part would be made therefor. Appellees then castrated 137 head of these young bulls, and the shipment of the 286 head moved from Texarkana on the following day, April 30, 1916, somewhere in the forenoon.

For their cause of action appellees alleged, substantially, that the Texas & Pacific Railway Company was guilty of negligence or negligently caused the castration of these young bulls, and that 17 head of them were so weakened by the operation that they were knocked down and trampled upon while en route to Timpson, and that 17 head of them died; that they were of the value each of $20. Appellees also alleged that on account of negligence on the part of both railroad companies in roughly handling the cars in which they were loaded 7 head of the cows were so injured that they died, and that these cows were of the value of $30 each. They also alleged, substantially, that on account of negligence on the part of both rail--

roads in roughly handling the cars 145 head of cattle, not including the bulls, were damaged to the extent of $3 per head. They sued for this total amount of damages, and also other items unnecessary here to mention.

The railroad companies and receivers answered by general demurrer and several special exceptions, general denial, and special pleas. They also specially set up the shipping contract, which, among other things, provides: (1) That the shipper assumed all risk of injury to or loss of stock because of their being wild, unruly, weak, or any inherent vices or defects, etc.; (2) that the carrier should not be liable for any delay or damage sustained by the stock, or any expense incurred by the shipper by reason of any enforcement or attempted enforcement by government officers of quarantine regulations, either federal, state, county, or municipal, whether such officers should act lawfully or unlawfully, or by reason of the existence of any quarantine regulations or laws, federal, state, county, or municipal. They also alleged that the castration of the bulls was made in compliance with the laws of the state of Texas, the laws of the state of Arkansas, and the laws of the United States, and that defendants and their agents were not guilty of any negligence in acting as they did. They also alleged that the cattle were wild, unruly, weak, and had inherent vices and defects, and that the shippers and laborers acting under them were guilty of contributory negligence, etc.

Appellees filed a supplemental petition in which the matters of fact alleged by the defendants were denied, etc. The trial was with the jury and their verdict consisted of answers to special issues, and judgment was rendered thereon in favor of appellees against the Texas & Pacific Railway Company in the sum of $500, but there was no recovery as against the Gulf, Colorado & Santa Fé Railroad Company. Motion for new trial was made by Texas & Pacific Railway Company, and was overruled, and that company alone has appealed.

[1] There are several assignments of error found in appellant's brief, but we shall not take them up in their numerical order, nor mention them specifically, because in the view we take of the case it is only necessary to dispose of that assignment which substantially complains that upon the undisputed facts appellant was not guilty of any negligence in causing, and in fact did not cause, appellees' bulls to be castrated, as claimed, and that since the jury expressly found in answer to special issues that there was no other negligence on the part of appellant, as charged by appellees, the verdict and judgment should have been in favor of appellant. This is the contention of appellant substantially.

We have given the case careful consideration, and have reached the conclusion that appellant's contention is correct, and that the judgment should be reversed and here rendered in favor of appellant. As we find the evidence in this record, there is practically no contradiction or dispute as to the facts touching this shipment of cattle, and they are, substantially, as follows:

In addition to what has been above stated, defendants below introduced a certified copy of the proclamation of the Governor of Texas, issued May 23, 1915, having reference to the shipment of live stock into the state of Texas, by which was given full power and authority to the live stock sanitary commission of the state of Texas to make rules and regulations pertaining to the admission of live stock into the state, and further providing that the live stock sanitary commission of Texas should have authority to make any rule or regulation to prevent live stock infected with tuberculosis from entering the state. There was also introduced by defendants a rule of the live stock sanitary commission of this state, of date January 21, 1916, which became effective February 1, 1916, providing as follows:

"Cattle for dairy and breeding purposes, over six months old, and cattle for exhibition within the state, must be accompanied by a health certificate, including the tubercular test, such certificate to show that the tubercular test was given within at least sixty days prior to the time the cattle entered the state."

It was then shown that the name of Dr. J. L. Hearn, Texarkana, Tex., was officially registered with the live stock sanitary commission of Texas. It was then shown by Dr. Hearn that he had no connection whatever with any railroad company, but, as above stated, was inspector of live stock for interstate shipment for both the state of Texas and the state of Arkansas, and that it was his duty to inspect live stock and pass upon its admission in the interest of the state. In this connection he said:

"It was my duty to inspect live stock that were to be transported into the state of Texas by railway companies, and ascertain whether or not they should be admitted. If I found a shipment of live stock from another state in the state of Texas, and there was no certificate showing that they had been tested for tuberculosis, and they were coming into the state for breeding or dairy purposes, it was my duty to give them the tubercular test.

"I am acquainted with the rule made by the live stock sanitary commission of Texas that went into effect February 1, 1916, with reference to cattle being admitted into Texas. I was in Ft. Worth attending the state veterinary medical association, and at the live stock sanitary commission office about March 15, 1916, and while there I asked for a ruling on live stock coming into Texas. I was in Ft. Worth about March 15, 1916. I know Mr. James, the foreman of the stock yards of the Iron Moun-

tain Railway, at Texarkana. I had a conversation with Mr. James after I returned from Ft. Worth and before this matter came up on March 30th. I told him to prohibit all bulls from coming into the state of Texas without the tubercular test."

It was further shown by this witness, on cross-examination, that he stopped the shipment of the bulls in question because he was instructed by the chairman of the live stock sanitary commission of Texas to that effect.

Without undertaking to quote the testimony of either of the appellees in detail, it will suffice to say that they testified, substantially, that they never even considered whether they would have the bulls in this shipment of cattle tested for tuberculosis when they were informed by Dr. Hearn that such would be necessary before the shipment could pass, but they further testified that they were given their choice in that matter, that is to say, they were permitted to choose whether they would have the bulls given the tubercular test or castrated, and that they chose the latter. Speaking with reference to appellant's agent at Texarkana, Mr. Burton stated:

"He let us take our choice and we castrated them. We did not consider the matter of having them tested for tuberculosis at all."

It was further shown by the appellees themselves that the cost of giving the tubercular test, as stated to them by Dr. Hearn, would have been 50 cents a head, but, as shown by Burton's statement above, they did not consider testing the cattle at all.

Now, as shown above, the jury acquitted appellant of any negligence in handling the shipment of cattle in question, but found that appellant caused the castration of the bulls, and that in doing so appellant was guilty of negligence. We have concluded that it cannot be said that appellant caused the castration of these bulls. Upon the whole evidence, the material parts of which we have stated, it is manifest that appellant's agent at Texarkana was acting in perfect good faith in trying to comply with the quarantine regulations, as he understood them, relative to the shipment of cattle into Texas, and that the railway company had no interest whatever in insisting upon the castration of these bulls, other than to comply with the quarantine regulations, as appellant's agent understood them to be; and, without deciding whether the proof of what the rules and regulations of the live stock sanitary commission of Texas were was of such character as to show that appellant acted in strict compliance with such rules in declining to receive the shipment of the bulls, we have concluded that it cannot be held that appellant's agent caused these bulls to be castrated. It is true that appellant's agent, acting in obedience to instructions of Dr. J. L. Hearn, refused to re-

ceive the bulls for shipment unless given the tubercular test or castrated, but it is also too clear for argument that appellees had their choice as between the tubercular test and castration, and no sufficient reason is shown why the bulls might not have been given the tubercular test and all damages here claimed to them prevented.

[2] We have been cited to no authority by appellees which we think supports their contention that appellant's refusal to receive and ship the bulls without the tubercular test or castration was the cause of the damage to appellees in this case, and, since upon the express findings of the jury no other damage to the shipment of cattle could be chargeable against appellant, there was no basis for a judgment against appellant in this case for any amount; and since it appears that the case was fully developed, and that no different result would probably be raised by remanding the cause, the judgment of the trial court will be reversed and here rendered in favor of appellant.

WALKER, J., did not sit in this case.